**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Douglas Edge,

Plaintiff,

v.

City of Saint Paul and Department of Fire and Safety Services,

Defendants.

Civil No. 01-1296 (RHK/SRN)
**MEMORANDUM OPINION AND ORDER**

---

Donald S. Arbor and Judith K. Schermer, Schermer Law Office, Minneapolis, Minnesota, for Plaintiff.

James F.X. Jerskey, Office of the Saint Paul City Attorney, Saint Paul, Minnesota, for Defendant.

---

## Introduction

On September 20, 2000, Defendant City of Saint Paul ("the City") and Defendant Department of Fire and Safety ("the Department")[1] withdrew Plaintiff Douglas Edge's conditional offer of employment as a firefighter based upon a psychologist's assessment that, inter alia, Edge suffered from depression. Edge commenced this action under the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA") alleging that

[1] The Department of Fire and Safety Services is a department of the City of Saint Paul, Saint Paul Legislative Code, Chapter 8, § 8.01, and therefore is not a party capable of being sued in its own name, see Galob v. Sanborn, 160 N.W.2d 262 (Minn. 1968) (holding that courts lack power to make division of municipality an entity capable of suing or being sued absent statutory authorization). The Court will therefore dismiss Edge's complaint against the Department.



FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

the City discriminated against him because it regarded him as disabled. The City moves for summary judgment on the ground that Edge has failed to establish a prima facie case for discrimination under either the ADA or the MHRA. Because the Court concludes there is a genuine issue of material fact, the motion will be denied.

## Background

The application process to become a Saint Paul firefighter is long and onerous. Upon announcing openings for the position of firefighter in May of 1999, the City of Saint Paul received 1,703 applications. (Arbour Aff. Ex. 8 (Saint Paul Firefighter Job Information) at 2.) Those applicants who passed a written exam were required to take the "physical performance test" ("PPT"), a mock firefighting drill. (Id. at 1.) To pass the PPT, candidates had to shoulder one hundred feet of hose weighing fifty-eight pounds and carry the bundle to a fifth floor landing, drag a hydrant-charged hose one hundred feet, walk backwards one hundred feet carrying a rescue mannequin, move a forty-seven pound exhaust fan fifty feet, and simulate forcible entry into a building. (Id. at 3.) Candidates were required to perform these drills in seven minutes, wearing full equipment, and without running. (Id.)

Upon completion of the written exam and the PPT, Douglas Edge ranked fifth among firefighter candidates. (Jerskey Aff. Ex. 8 (Letter to Edge).) At thirty-four years of age, Edge had been a Navy firefighter during the Gulf War, where he earned a Bronze Star, and currently was employed as a street maintenance worker for the City of Maplewood. (Jerksey Aff. Ex. 3. (Edge Dep.) at 133:3-7.) After the PPT, Edge was among the handful of applicants to receive an offer of employment, conditioned upon the results of a background check, criminal history

check, medical examination, treadmill stress test, drug and alcohol test, and certification as an Emergency Medical Technician. (Jerksey Aff. Ex. 11 (Offer Letter).)

Most significantly, Edge, along with the other applicants, was required to receive satisfactory results on a psychological assessment. (Id.) Dr. Gary Fischler, the psychologist in charge of the examination process, outlined the assessment's rationale:

> The purpose of [the psychological testing is] to determine the presence, if any, of the emotional or intellectual characteristics that would, or might, detrimentally affect the subject's performance in the role of firefighter. Factors considered are those generally agreed to be crucial to effective performance in the role of firefighter. Persistence, self-restraint, acceptance of supervision and criticism are sampled. An effort is also made to determine stress resistance and possible bias. All of the foregoing is almost universally considered relevant criteria in the selection of firefighters.

(Arbour Aff. Ex. 1 (Fischler Report) at 1.) The candidates were given a series of tests, including the Shipley Institute of Living Scale, the Edwards Personal Preferences Schedule, the Social Opinion Inventory, the How to Supervise Test, the California Personality Inventory, the Candidate and Officer's Personnel Survey ("the COPS test"), and the Minnesota Multiphasic Personality Inventory.[2] (Arbour Aff. Ex. 1 at 2.) Upon the completion of these tests, Edge and the other candidates were given an exit sheet explaining that if they were not recommended following the evaluation, it was not because they were "crazy," but instead because they were "unlikely to succeed in public safety work."[3] (Jerksey Aff. Ex. 13 (Candidate Exit Sheet).)

---

[2] Although the report indicates that Dr. Fischler gave Edge the Firefighters Situations Test, Dr. Fischler testified that Edge, in fact, was not given that test. (Jerksey Aff. Ex. 5 (Fischler Dep.) at 24:10-24:16.)

[3] Paragraph three of the Candidate Exit Sheet reads in its entirety:

If you are not recommended for appointment, please do not assume that we have found

As part of the assessment, Edge completed a Mental Health History Disclosure Form on which he indicated he had previously sought treatment for depression from Dr. Robert Rothstein, a psychologist with the Allina Clinic in Woodbury, and had received a prescription for Paxil from a family physician. (Arbour Aff. Ex. 4 (Edge Mental Health History Disclosure Form).) During the oral interview, Dr. Fischler asked Edge about his appointments with Dr. Rothstein (Jerksey Aff. Ex. 5 at 33:13-24) and whether he had ever entertained thoughts of suicide (Id. at 83:18-23). Edge said that he had. (Id.) As he testified:

> Q. Have you ever had any suicidal thinking . . .?
>
> A. I guess the best way I can describe is while I was in the military my – my friend had killed himself and hung himself. And here's a person who I looked up to, I thought he had everything going in his life and I had all these problems. So did the thought—if he did that, then... So did the thought go through? Yes.

(Jerksey Aff. Ex. 3 (Edge Dep. at 133:3-7).) On the basis of the test results and the interview, Dr. Fischler prepared a recommendation for the City:

> Mr. Edge is a 34-year-old firefighter candidate without public safety experience. Tests indicate average intelligence. Unfortunately, test results also indicated underlying problems with anxiety, low self-esteem, low self-confidence, and indecisiveness. He also has had problems with depression in the past and continues to take anti-depression medication. He also has had some suicidal thinking in the past, although he denies any suicidal thinking currently. As a result of these issues, Mr. Edge's ability to tolerate high levels of stress and respond appropriately to critical situations without being bothered by life-threatening circumstances is questionable.

---

you to be "crazy." In most cases, a decision not to recommend someone is based on aspects of the individual's personality that make him or her someone who is unlikely to succeed in public safety work. This person may in fact be very likely to succeed in some other area of work. Additionally, in some instances, our decision not to recommend a candidate may be based upon factors that could change over time. Thus, a rejected candidate could be recommended in an evaluation conducted two or three years later. This has happened in several instances. (Jerksey Aff. Ex. 13.)

(Arbour Aff. Ex. 15 (Fischler Report) at 15.) The report concluded, "ON THE BASIS OF THE ENTIRE EXAMINATION, THE SUBJECT IS **NOT RECOMMENDED** FOR THE POSITION SOUGHT." (Id. (emphasis in original).)

Dr. Fischler's report was distributed to the Assistant Chief Carter, who met with Chief Fuller, the other Assistant Chiefs, and Dr. Fischler to discuss the results. (Jerksey Aff. Ex. 4 (Asst. Chief Carter Dep.) at 21:16-22:24.) Following the meeting, the Department revoked Edge's conditional offer of employment. (Id. at 84:20-25.) On September 20, 2000, the City sent Edge a letter explaining why it had withdrawn its offer: "Failure to pass Phase II of background investigation. Not recommended by Dr. Fischler." (Jerksey Aff. Ex. 12 (Offer Withdrawal Letter).) Nine months later, Edge filed suit.

**Standard of Decision**

"Summary judgment is appropriate only in 'those rare instances where there is no dispute of fact and where there exists only one conclusion.'" Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (quoting Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991)). If the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, then summary judgment is proper. Heaser v. Toro Co., 247 F.3d 826, 830 (8th Cir. 2001). "If the party with the burden of proof at trial is unable to present evidence to establish an essential element of that party's claim, summary judgment on the claim is appropriate because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" St. Jude Med., Inc. v. Lifecare Int'l, Inc., 250

F.3d 587, 595 (8th Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "[S]ummary judgment should seldom be granted in discrimination cases." Bassett v. City of Minneapolis, 211 F.3d 1097, 1099 (8th Cir. 2000).

**Analysis**

In an employment discrimination case, the plaintiff must initially present a prima facie case to survive a motion for summary judgment. See Lidge-Myrtil v. Deere & Co., 49 F.3d 1308, 1310 (8th Cir. 1995) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)). The employer must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. See Kiel v. Select Artificals, Inc., 169 F.3d 1131, 1135 (1999); Lidge-Myrtil, 49 F.3d at 1310. If the employer does this, the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual. Kiel, 169 F.3d at 1131. Here, the parties' briefing focuses on the first stage of the McDonnell Douglas framework, the prima facie case.

In order to establish a prima facie case of employment discrimination under the ADA and the MHRA, the plaintiff must show (1) that he has a disability within the meaning of the statutes, (2) that he is qualified to perform the essential functions of the job, with or without reasonable accommodation, and (3) that he suffered an adverse employment action because of his disability. See Cooper v. Olin Corp., Winchester Div., 246 F.3d 1083, 1087 (8th Cir. 2001). The City's sole challenge to Edge's prima facie case is that he does not satisfy the first element; in other words, he is not an individual with a disability under the statutes.

A "disability" is defined by the ADA as: "(A) a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); see also Sutton v. United Air Lines, Inc., 527 U.S. 471, 478 (1999). While the language of the MHRA exchanges the word "materially" for "substantially," Minn. Stat. § 363.01, subd. 13, the difference is "merely semantic,"[4] Webber v. Strippit, Inc., 186 F.3d 907, 912 n.4 (8th Cir. 1999); see also Snow v. Ridgeview Medical Center, 128 F.3d 1201, 1206 (8th Cir. 1997). Edge does not argue that he had an actual limiting impairment or a "record of" disability at the time he sought employment. (See Pl.'s Mem. Opp'n Summ. J. at 2.) Rather, he contends he suffered discrimination because he was "regarded as" being substantially limited by the City in the major life activity of working.[5]

A substantial limitation on the major life activity of working requires that a person be significantly restricted, in comparison with the average person with comparable training, skills, and abilities, in the ability to perform either (1) a class of jobs or (2) a broad range of jobs in various classes. See Sutton, 527 U.S. at 492-493; 29 C.F.R. § 1630.2(j)(3)(i). EEOC regulations define a "class of jobs" as "[t]he job from which the individual has been disqualified . . . and the number and types of jobs utilizing similar training, knowledge, skills or abilities within that geographical area." 29 C.F.R. § 1630.2(j)(3)(ii)(B). The regulations define a "broad range of

---

[4] The Eighth Circuit has previously "assumed, without deciding, that analysis of a disability claim under the MHRA mirrors analysis under the ADA." See Webber, 186 F.3d at 912; Roberts v. KinderCare Learning Ctrs., Inc., 86 F.3d 844, 846 n.2 (8th Cir. 1996). Here, because neither of the parties draws any distinction between these two statutes, see Webber, 186 F.3d at 912, the Court proceeds under the same assumption.

[5] Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(1).

jobs in various classes" as "the job from which the individual has been disqualified . . . and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(C). Thus, in order to establish that the City regarded him as substantially limited in the major life activity of working, Edge must demonstrate that the City regarded him as being precluded from more than one type of job, a specialized job, or a particular job of choice. Sutton, 527 U.S. at 492. In short, Edge must "produce evidence that he was regarded as unable to perform other jobs than that of firefighter." Shipley v. City of University City, 195 F.3d 1020, 1023 (8th Cir. 1999).

The City asserts that summary judgment is appropriate because it only believed Edge was limited as to the job to which he had applied. The City relies heavily on the cover page accompanying Dr. Fischler's report to the City, which indicates the purpose of the report was to determine the presence of "emotional or intellectual characteristics that would, or might, detrimentally affect the subject's performance in the *role of firefighter*." (Arbour Aff. Ex. 1 at 1 (emphasis added).) The report continues, "Factors considered are those generally agreed to be crucial to effective performance in the *role of firefighter*." (Id. (emphasis added).) Indeed, the City sought to identify qualities such as persistence, self-restraint, acceptance of supervision, and resistance to stress that it believed were "universally considered relevant criteria *in the selection of firefighters*." (Id. (emphasis added).)

As the City points out, while working may be a major life activity, firefighting most assuredly is not. See Shipley, 195 F.3d at 1023 (affirming summary judgment for employer where plaintiff did not produce evidence that he was terminated for any reason other than

concern about his capacity to perform as a firefighter); Smith v. City of Des Moines, 99 F.3d 1466, 1474 (8th Cir. 1996) (upholding summary judgment for employer where evidence that city regarded fire captain as unable to perform duties of firefighter did not establish that the city believed that he was unable to perform other jobs); Welsh v. City of Tulsa, 977 F.2d 1415, 1419 (10th Cir. 1992) (affirming summary judgment for employer where impairment perceived by employer as limiting only for the purposes of firefighting was not regarded as a substantially limiting impairment); see also Miller v. City of Springfield, 146 F.3d 612, 617 (8th Cir. 1998) (upholding summary judgment for employer where plaintiff could demonstrate only that city believed her unsuited to job as police officer because of psychological screening); Wooten v. Farmland Foods, 58 F.3d 382, 386 (8th Cir. 1995) (affirming summary judgment for an employer and holding that plaintiff was not disabled because his impairments "only appeared to prevent him from performing a narrow range" of jobs).

This line of cases is distinguishable because there was no evidence that the employer viewed the plaintiff as unsuited to anything other than the job at hand. Here, while the City clearly believed Edge was poorly suited for firefighting, the record also reveals a notable focus by the City on Edge's suitability for public safety work in general. This is particularly true with Dr. Fischler's interpretation of Edge's scores on the various testing instruments. For instance, Dr. Fischler interpreted Edge's "abasement score" on the Edwards Personal Preference Schedule as "suggestive of a self-blaming person, which could be problematic in *public safety*." (Arbour Aff. Ex. 1 (Fischler Report) at 3 (emphasis added).) Dr. Fischler administered the COPS test to Edge as a "predictor of probable success in *public safety work*" (Arbour Aff. Ex. 1 at 4 (emphasis added)) and Edge's scores on the "Self-Discipline" section suggested to Dr. Fischler,

"if this person is now seeking a job in *public safety*, it may be, in part, to compensate for earlier feelings of inadequacy."[6] (Arbour Aff. Ex. 1 at 8.) Furthermore, the summary Dr. Fischler prepared as part of the report noted that Edge was "without *public safety* experience." (Arbour Aff. Ex. 1 at 15.) Finally, the Candidate Exit Sheet, provided to Edge when he left Dr. Fischler's assessment, states, "In most cases, a decision not to recommend someone is based upon aspects of the individual's personality that make him or her someone who is unlikely to succeed in *public safety work*. This person may in fact be very likely to succeed in *some other area of work*." (Jerksey Aff. Ex. 13 (emphasis added).)

Viewing this language in the light most favorable to Edge, the Court finds a triable issue of fact as to whether the City viewed Edge's depression as substantially limiting him with regard to the class of public safety jobs.[7] Indeed, the Court determines that a reasonable jury could find

---

[6] Despite the fact the report indicates that Edge was given the "Firefighter's Situations Test," Dr. Fischler testified in deposition that the test was not given to him. (Jerksey Aff. Ex. 5 (Fischler Dep.) at 24:13-16).)

[7] While Edge also presented evidence regarding a "broad range of jobs," that evidence fails to conform to EEOC definition. Edge's expert examined jobs that require "similar vocation profiles and hiring qualifications to that of a Fire Fighter" (Arbour Aff. Ex. 2 (Report of Jan Lowe, M.S.) at 3) and demand that the worker "tolerate high levels of stress and respond appropriately to critical situations without being bothered by life threatening circumstances" (Jerksey Aff. Ex. 15 at 2). According to the expert's report, the City's criteria would preclude Edge from 112,800 positions throughout Minnesota, including jobs as a policeman, paramedic, security guard, correctional officer, and emergency medical technician. While this data does not satisfy the standard for a broad range of jobs, which EEOC regulations define as those "not utilizing similar training, knowledge, skills or abilities," 29 C.F.R. § 1630.2(j)(3)(ii)(C), it is indicative of a class of jobs, which includes those that do utilize "similar training, knowledge, skills or abilities," 29 C.F.R. § 1630.2(j)(3)(ii)(B). Needless to say, in a "regarded as" action, such testimony is not sufficient by itself; the plaintiff must also submit evidence that the employer's requirement reflected a *belief* that the plaintiff's impairment precluded him from a class or broad range of jobs. See Sutton, 527 U.S. at 493-94 ("It is not enough to say that if the physical criteria of a single employer were *imputed* to all similar employers one would be regarded as substantially limited in the major life activity of working *only as a result of this*

public safety to be job category encompassing, at the very least, firefighters, law enforcement, and emergency medical personnel. See Marschand v. Norfolk and W. Ry. Co., 876 F. Supp. 1528, 1540 (N.D. Ind. 1995) (describing public safety as a "field" encompassing "police officer, fireman or ambulance driver"). At its broadest, a jury might construe "public safety" to include correctional officers, lifeguards, police, fire, and ambulance dispatchers, transit police, security guards, and other positions listed in Edge's expert report. (See Arbour Aff. Ex. 2.)

Where a hiring decision is based largely or entirely on a recommendation or evaluation made by an employee who perceived the applicant as disabled, that opinion is imputed to the employer in an "as regarded" action. Olson v. Electric Astrospace AKA Martian-Marietta Astrospace, 101 F.3d 947, 955 (3d Cir. 1996). The record here indicates that Dr. Fischler forwarded his report to Assistant Chief Anthony Carter, who in turn provided input on the decision to revoke Edge's conditional offer, a decision that was expressly based on Dr. Fischler's analysis and recommendation. Thus, Edge has adduced sufficient facts for a jury to infer that the City believed that his depression rendered him as unable to perform the class of public safety jobs; Edge has therefore made a prima facie showing that he is a disabled person within the meaning of the ADA.[8]

---

*imputation*.") (emphasis in original). The Court concludes that Edge has done so with regard to a class of jobs.

[8] In its moving papers, the City indicates that an alternative ground for summary judgment is that its decision not to hire Edge was job-related and based upon business necessity. (Def.'s Mem. Supp. Mot. Summ. J. at 1.) However, the City quickly loses interest in this contention and neither advances evidence nor engages in any legal analysis to support it. While the City has pled 42 U.S.C. § 12113(a) as an affirmative defense, the only analysis that could reasonably be construed as relating to this provision cites to another portion of the ADA dealing with the propriety of the psychological screening itself, which Edge has not challenged. (See Id.

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that

1. The Complaint (Doc. 1) against Defendant Department of Fire and Safety Services is hereby **DISMISSED** on the grounds that Department of Fire and Safety Services is not a proper party.

2. Defendant City of Saint Paul's Motion for Summary Judgment (Doc. 18) is **DENIED.**

Dated: October 7, 2002

RICHARD H. KYLE
United States District Judge

---

at 15 (citing 42 U.S.C. 12112(d)(4)(A).) Having failed to advance evidence or engage in analysis, the City is not entitled to summary judgment on this defense. See Fed. R. Civ. P. 56(c).